This summary process action is brought to terminate a sublease between the plaintiff and the defendant for premises at 28 Main Street in West Haven (the "premises"). The plaintiff, Cumberland Farms, alleges that the defendant Dairy Mart has failed to pay rent due under the sublease, thus giving the plaintiff the right to regain possession. (At trial the plaintiff abandoned the second alleged ground for lease termination.) The nonpayment claim is disputed by Dairy Mart, which has also filed several special defenses. (The defendant Jeffrey R. Kopp is a sub tenant of Dairy Mart's at the premises. Chevron USA Inc., which is also a defendant, has stipulated to be bound for any judgment in this action. Neither of these defendants took any active role at trial.)
Dairy Mart has operated a convenience store and gasoline station CT Page 5383 at the premises since 1979. The premises are owned by Rocklen, Inc. and Sherman Rocklen (together "Rocklen") who, in 1975, leased the premises to Chevron USA Inc. ("Chevron") for a twenty-two-year term with a renewal option. In 1979, Chevron sublet the premises to Dairy Mart pursuant to a written sublease. Several years later, in 1986, the plaintiff Cumberland Farms' purchased certain of Chevron's assets, including Chevron's interest in the premises. As a result, Cumberland became Dairy Mart's landlord under the sublease.
The sublease requires that Dairy Mart pay monthly rent of $2083.33 plus additional rent based on the gallonage of gasoline sold at the premises if it exceeds a certain minimum gallonage. In addition, the sublease obligates Dairy Mart to pay the real estate taxes for the premises during the lease term. Cumberland alleges that Dairy Mart failed to pay monthly rent from May 1, 1988 through December 1, 1989, that it failed to provide gallonage statements and to pay gallonage rent due for the period ending June 30, 1989 and that it failed to pay real estate taxes as required.
Dairy Mart filed several special defenses in this action, one of which is clearly dispositive of the plaintiff's claim. The defendant has claimed the benefit of the equitable defense against forfeiture, asserting that on the facts of this case, judgment of possession should not enter for the plaintiff. The court agrees.
Our Supreme Court has recently reaffirmed the availability in summary process actions of equitable relief from forfeiture. Fellows v. Martin, 217 Conn. 57 (1991). In Fellows, the defendant tenant, who was in possession pursuant to a ninety-nine year lease which had required a $9900.00 advance rental payment, withheld a payment of $25.01 because of a dispute over a parking space. The Supreme Court reversed the trial court's entry of judgment of possession for the landlord, finding that the lessor's loss was small, the default slight and the hardship to the tenant great. Id. at 58. In her concurring opinion, Chief Justice Peters stated
 The facts of this case, however, present a compelling case for equitable intervention on the ground of forfeiture. In light of the tenant's substantial investment in the leasehold, it was plain error for the trial court to have rendered judgment, awarding possession to this landlord. . . . Since the tenant's breach was not willful . . . forfeiture of her interest would be wholly disproportionate to the gravity of her default.
Id. at 72. The facts of this case, although more complex, present the same compelling circumstances which require equitable relief from forfeiture of the sublease. CT Page 5384
Cumberland Farms became Dairy Mart's landlord under the sublease on May 31, 1986. On that date, Cumberland purchased the so-called "marketing assets" of Chevron in ten states in the northeastern United States. The landlord's interest in the premises was one of these assets acquired by Cumberland. The sublease was assigned by Chevron to Cumberland. The Chevron acquisition was a major transaction for Cumberland in terms of the assets acquired, which included approximately six hundred gasoline stations in ten states as well as other assets. Despite the change in landlords, Cumberland never sent Dairy Mart any letter or formal notice informing Dairy Mart of the assignment of the sublease or the name and address of the new landlord under the sublease and the specific address where rental payments should be sent.
Prior to June 1, 1986, Dairy Mart paid Chevron the monthly rent due under the sublease by sending the payment to Chevron in Concord, California. After Cumberland acquired the Chevron assets, Dairy Mart continued to pay rent in this same manner. From June 1, 1986 until April 1, 1988, Dairy Mart sent the monthly rent payments to Chevron in Concord, California. Because of the enormity of the Chevron-Cumberland transaction, Cumberland was not prepared immediately on June 1, 1986 to take over all the billing and accounting responsibilities for the newly acquired assets. Therefore, Chevron continued to do the billing for Cumberland during a transition period. As a result, Chevron accepted the Dairy Mart rent payments beginning in June, 1986 and forwarded them to a Cumberland lockbox in Pittsburgh, Pennsylvania. The rental payments were therefore duly paid and credited to Cumberland.
Beginning in April, 1988, however, Chevron refused to accept Dairy Mart's rent checks any longer. Chevron was no longer providing billing or accounting services to Cumberland and it began returning the monthly rent checks to Dairy Mart. Dairy Mart continued for a period of time to attempt to pay rent by forwarding checks to California, but Chevron returned all the checks beginning in April, 1988.
When Chevron started returning the rent checks, Dairy Mart began to investigate why the checks were being returned. A phone call was made to Chevron. Chevron stated that no rent was owed Chevron, that Dairy Mart should contact Cumberland. Dairy Mart personnel then initiated a series of contacts with Cumberland in an attempt to verify that rent was owed to Cumberland and to determine the address where the rental payments should be sent. These calls began to be made in June, 1988. Cumberland personnel seemed lax in investigating and responding to Dairy Mart's initial inquiries. It was generally Dairy Mart and not Cumberland which initiated the calls and pursued the matter. CT Page 5385
Cumberland personnel were having difficulty determining if rent was due. Part of Cumberland's difficulty arose from an internal error made by Cumberland. In April, 1981, Dairy Mart canceled the gasoline supply contract for the premises pursuant to which Cumberland had supplied gasoline for the gas station at the premises. Cumberland therefore terminated its gasoline billing system for Dairy Mart. Erroneously, however, Cumberland personnel terminated all billing to Dairy Mart, including the billing for the real estate rent for the premises. As a result of this mistake, Cumberland did not send out any invoices for the rent for the premises after June, 1987. The absence of invoices made it more difficult for Cumberland to determine whether rent was due.
In November, 1988, an employee in the real estate department at Cumberland told a Dairy Mart employee that she did not think that Dairy Mart owed any money and Dairy Mart should contact stated. Chevron. Eight months had now passed since the Dairy Mart rent checks began to be returned and Cumberland still could not determine if Dairy Mart owed rent to Cumberland for the premises. Dairy Mart had tried with reasonable diligence to determine why rent checks were being returned by Chevron, to whom rent should be paid and at what address. Cumberland personnel responded to these inquiries with little interest and no answers.
Two former employees of Cumberland acknowledged in their testimony that from 1986 or 1987 until February, 1989, Cumberland took no affirmative action to collect any unpaid rent from Dairy Mart. On February 24, 1989, Tony Lauro, a regional manager for Cumberland, sent a letter to Dairy Mart at its Enfield headquarters with respect to the rent due for the premises. The letter erroneously claimed that Dairy Mart had failed to pay rent for the premises all the way back to July 1, 1986 and requested that all payments be brought current by sending a check to Lauro. The letter failed to acknowledge that Cumberland had in fact been paid for the rent from June 1, 1986 until April, 1988. The letter also misstated the amount of the monthly rent payment.
Lauro's letter was turned over to Laura Messina at Dairy Mart. She had begun handling leases at Dairy Mart in January, 1989 and had unsuccessfully made her own inquiries to Chevron and Cumberland to determine where rent should be paid. After receiving Lauro's letter in February, she spoke with him over the phone and then ordered copies of the Dairy Mart canceled checks showing that rent was in fact paid from June 1, 1986 until April, 1988. On April 13, 1989, Messina sent Lauro copies of all the canceled checks showing that rent was paid until April, 1988. Her letter explained that Dairy Mart had stopped sending rent checks after April, 1988 because Chevron was returning them. She also sent him copies of the notes which Dairy Mart personnel had CT Page 5386 kept, recording their phone calls made in an effort to determine where to send the rent. She concluded her letter by asking for a recalculation of the rents due to Cumberland and stated, "I will have a check forward [sic] to your attention upon receipt of the new figures."
It is undisputed that Cumberland did not recalculate the amount of rent due and send the new figure to Dairy Mart until November, 1989, some seven months later. In the interim, Messina called Lauro several times to determine why there was such a delay. She also sent Lauro the real estate tax bill she received in June, mistakenly believing that it was Cumberland's obligation to pay the bill.
By letter dated November 6, 1989, Cumberland gave Dairy Mart notice of default under the sublease. This notice of default is given in the very same letter in which Cumberland finally calculates the amount of rent due. This November letter is Cumberland's response to Messina's April letter, requesting the calculation and offering to pay upon receipt of a new figure. In the letter, Steven Winters, the manager of leasing for Cumberland, accepts Messina's statement that Dairy Mart had paid rent until April, 1988. He calculates the rent due from that date through November, 1989 as $39,583.27. He also asks for another set of copies of the canceled checks for the rent prior to April 1, 1988. Winters makes additional new requests as well. For the first time, he asks for gallonage statements for the years ended 6/30/87, 6/30/88 and 6/30/89 as well as gallonage rent if due. He also requests for the first time reimbursement for real estate taxes on the premises totaling $23,677.90, which were paid by Cumberland instead of Dairy Mart. He states that he is enclosing tax bills and canceled checks to confirm these tax payments, but the copies are inadvertently left out of the envelope. Winters states in the letter that the letter serves as notice to cure these defaults, but no time to cure is
Upon receiving Winters' letter, Messina called him to indicate that copies of the tax bills and canceled checks were not enclosed. She also told him she would process the payment to Cumberland immediately on receipt of the copies. Winters sent the copies to Messina by letter dated November 10, 1992. Messina received his letter on November 14, verified the figures and on that same day requested a check payable to Cumberland from the Dairy Mart accounting department for $63,065.55, the total rent and real estate tax reimbursement which was due. She also requested the gallonage figures from the gasoline department in order to calculate any gallonage rent due. On December 1, she sent the gallonage figures to Winters. She did not include a check for the $1573.58 in gallonage rent which was due because she thought Winters would want to verify the gallonage figures first. CT Page 5387
Although Dairy Mart checks are normally prepared in about two weeks after request is made, there was a delay in the preparation of the Cumberland check for two reasons. The first reason was that the size of the check was unusually large for a rent check and the check request was therefore handled somewhat differently than the normal fashion. After this handling, there was negligence on Dairy Mart's part as the check request was misplaced on someone's desk.
When there was some delay in the issuance of the check, Messina followed up with the accounting department and had the check delivered to her so she could forward it to Winters. A check for $63,065.55 to Cumberland Farms was issued dated December 14, 1989. On Friday, December 15, Messina had the check in her possession. She called Winters on December 15, told him that she had the check in hand and apologized for the delay. Winters, however, responded that the matter had been turned over to Cumberland's legal department. Messina nevertheless prepared a transmittal letter dated December 15, enclosed the check and placed the envelope in the office mail on the afternoon of December 15. On that same day she also requested a check to Cumberland for the December, 1989 rent.
On that same day, December 15, 1989, between 6:00 and 6:30 p.m., after Messina had phoned Winters and after she had put the check to Cumberland in the office mail, Dairy Mart received a letter which was hand-delivered from general counsel for Cumberland. He advised that the sublease was terminated effective Tuesday, December 26, for nonpayment of rent. Thereafter, on December 20, 1989, Connecticut counsel for Cumberland prepared and signed a notice to quit. No evidence was offered as to when this notice to quit was served.
December 15, 1989 was a Friday. Cumberland received Dairy Mart's check for $63,065.55 sometime during the week of December 18, prior to the stated termination date of the lease December 26. When received, the rent check arrived in an envelope postmarked December 18. On December 21, 1989, Dairy Mart issued an additional check to Cumberland for the monthly rent for the month of December. In February, 1990, Dairy Mart paid the gallonage rent which was due for the year ended June 30, 1989. (There was no gallonage rent due for any of the other years.) Dairy Mart also paid interest to Cumberland at that time on the real estate tax payments.
Since December, 1989, Dairy Mart has paid monthly rent, gallonage rent and real estate taxes for the premises, all as required under the terms of the sublease. The alleged default for non-payment of rent which gives rise to this action is based on the late tender of the $63,065.55 in back rent and real estate taxes and of $2,083.33 in rent for December, 1989. After the delivery of the CT Page 5388 termination notice on the evening of December 15, Cumberland returned both checks to Dairy Mart, explaining that they could not be accepted because of the termination of the lease.
It is true, based on these facts, that Cumberland made late tender of the monthly rent due from May 1, 1988 through December 1, 1989. The late tender resulted, however, from negligence on the part of both Cumberland and Dairy Mart. Cumberland never gave formal notice to Dairy Mart of the assignment of the sublease or the change in landlords under the sublease. It never said, in effect, We are your new landlord and we want you to send your rent to the following address: ____________________." In the absence of such a formal notice, Dairy Mart continued its prior programmed practice of sending rent checks to Chevron in California. In so doing, Dairy Mart did ignore the several rent invoices which it received in 1987 from Cumberland, which directed payment to the lockbox in Pittsburgh. In 1988, however, when Chevron began returning the rent checks, Cumberland was no longer sending invoices for rent. The absence of such invoices left Dairy Mart without rental invoices to which it could refer. Dairy Mart's inquiries to Cumberland about the rent after Chevron began returning the rent checks were met by inattention and/or confusion at Cumberland. Cumberland itself could not determine if rent was due. In its post-trial memorandum, Cumberland acknowledges, "There may have been confusion within Cumberland and Cumberland may have made some mistakes . . . ." (p. 68) Seven months passed, from April to November, 1989, before Cumberland could calculate the amount of rent it claimed to be due. In the interim, Dairy Mart affirmed its willingness and intention to pay rent once a figure could be agreed on. However, Cumberland did not provide all of the supporting materials to Dairy Mart until November 14, 1989. On December 15, 1989, after the close of business, Cumberland delivered a notice of lease termination despite knowledge that Dairy Mart was that day ready to forward a check for payment in full of the monthly rent and real estate taxes.
Dairy Mart had not paid the real estate taxes since April, 1985 because Cumberland never sought such payments. Although the sublease requires Dairy Mart to pay the real estate tax bills directly to the Town of West Haven, Chevron's practice had been that Chevron paid the real estate tax bills to the Town and then requested reimbursement from Dairy Mart. After Cumberland became the landlord under the sublease, Cumberland paid the tax bills, but never requested reimbursement from Dairy Mart until Steve Winters' letter of November 6, 1989 (with copies of the tax bills not enclosed.) Cumberland never informed Dairy Mart how it wished to handle the real estate tax payments, i.e., in the same manner as Chevron had or by Dairy Mart paying the Town directly. CT Page 5389
Dairy Mart was remiss in not providing gasoline gallonage statements to Cumberland, but again, it must be noted that Cumberland never asked for such statements until the November 6, 1989 letter. Once the statements were sought, they were provided. Gallonage rent was due for only one year and this was later paid by Dairy Mart.
Our Supreme Court has indicated that two factors should be considered in determining whether to grant equitable relief in nonpayment of rent cases. Fellows v. Martin, supra at 66. The first is whether, in the absence of equitable relief, one party will suffer a loss which is "wholly disproportionate" to the injury to the other party. The second factor is whether the injury to the other party is reparable.
The court finds that Dairy Mart will suffer a loss which is wholly disproportionate to Cumberland's injury if equitable relief is not granted. Dairy Mart has operated a convenience store and gasoline station at the premises since 1979. In the intervening thirteen years, Dairy Mart has invested approximately $420,000.00 in capital improvements to the premises. This "substantial investment in the leasehold" (Chief Justice Peters' wording from Fellows v. Martin, supra at 72) like the $9,900.00 advance payment in Fellows, would be lost if the lease were to be terminated. Moreover, under the sublease Dairy Mart has an option to purchase the premises for an option price of $350,000. The parties stipulated at trial that the current fair market value of the premises is $800,000.00. The option to purchase the premises at a price substantially below the current market value is obviously a very valuable right which would be lost if the sublease were terminated.
The loss to Cumberland, on the other hand, is the $65,148.88 in unpaid rent and real estate taxes, which was tendered by Dairy Mart in December, 1989, but returned by Cumberland. On a purely mathematical basis as well as from a broader perspective, Dairy Mart's potential loss is wholly disproportionate to Cumberland's injury. Moreover, however, Cumberland's loss is reparable, the second factor cited in the Fellows case. Although Dairy Mart has not made a second tender of the arrearage, counsel for Dairy Mart stated at oral argument that the company acknowledges its obligation to pay the arrearage and that the obligation will be honored. If, for some reason, this is not accomplished voluntarily, Cumberland has recourse to the courts by way of a civil suit for the arrearage amount. Cumberland's loss is reparable.
Cumberland argues for a more expansive view of its injury Cumberland claims that it was exposed to a possible default under its lease with Rocklen in that Dairy Mart's failure to provide CT Page 5390 gallonage statements to Cumberland prevented Cumberland from providing such statements to its landlord, Rocklen, as required, thus causing Cumberland to breach its lease. This claimed injury is speculative only, however. There was no evidence that Rocklen ever made any claim that Cumberland was in default or that the landlord took any action to terminate Cumberland's lease. This claim is without merit.
Cumberland also claims that it will be injured if the sublease is not terminated because in that event, Cumberland will not have the option to purchase the premises. It is true that if the sublease were terminated, Cumberland would own the option to purchase the premises, which is contained in the lease with Rocklen. However, Cumberland erroneously assumes that the option is equally available to either Dairy Mart or Cumberland, subject to the decision of this court on the termination of the sublease. In negotiating the sublease, Chevron, Cumberland's predecessor, conveyed the option to purchase to Dairy Mart. The option, therefore, belongs to Dairy Mart subject only to its forfeiting the option if the sublease is terminated. The loss of the option, therefore, figures significantly in the analysis of Dairy Mart's loss, but is not part of Cumberland's injury from the default.
It must also be noted that the proper analysis of Cumberland's injury may be limited to only that injury suffered as a any change in Cumberland's position between the dates when the rent and real estate taxes were due and the date when tendered. R R of Connecticut, Inc. v. Stiegler, 3 Conn. App. 240, 246
(1985). Whether viewed so narrowly or analyzed more broadly, Cumberland's reparable loss is far less than that which would be suffered by Dairy Mart if equitable relief is not granted.
Cumberland also attempts to minimize the calculation of Dairy Mart's losses by offering to compensate Dairy Mart for its capital improvements to the premises. During trial and afterward in his brief and at oral argument, counsel for Cumberland extended an offer from Cumberland to pay Dairy Mart the book value of Dairy Mart's improvements to the premises as of the date Dairy Mart would vacate the premises. This unusual offer was not accepted by Dairy Mart. Cumberland has offered no precedent to guide the court as to the appropriate use of this offer. The issue before the court is possession of the premises and whether to grant equitable relief. The granting of such relief depends on an evaluation of the losses of both parties.
Dairy Mart has not accepted Cumberland's offer. Because of the non-acceptance and because it does not appear appropriate to the court for the court to engage in or encourage efforts by one party to buy out the other party's damages in order to alter the process of comparing losses, the court will not attach any significance CT Page 5391 to the offer by Cumberland. (The court's awareness by judicial notice of Cumberland's recent bankruptcy filing confirms the court's inclination that Cumberland's offer should not be considered in analyzing the parties' respective losses. The enforceability of such an offer, even if accepted, would be questionable in light of the bankruptcy.) Moreover, even if Dairy Mart were to be compensated for the capital improvements, its loss of the option to purchase would still make the Dairy Mart loss disproportionate to Cumberland's unpaid rent.
Cumberland also argues that Dairy Mart is not entitled to equitable relief because it has not tendered interest with the arrearage. It must be noted, first, that Cumberland never demanded interest from Dairy Mart until the post-trial memorandum and final argument in this case. Steve Winters' letter of November 6, 1989 did not ask Dairy Mart for interest and the failure to pay interest is not alleged in the complaint.
In reviewing the two factors to be considered in granting equitable relief from forfeiture, the Supreme Court in Fellows did not impose a requirement for the payment of interest. The Court discussed the balancing test with respect to the injuries to be suffered by the landlord and the tenant and noted the decision of Danpar Associates v. Falkha, 37 Conn. Sup. 820 (Appellate Session 1981), where the court cited the principle that equity may relieve against a forfeiture for failure to pay rent "upon payment or tender of all arrears of rent with interest." Id. at 823. However, the Supreme Court refers to this as yet another basis for granting equitable relief, not a requirement in all cases of equitable relief. Fellows v. Martin, supra, at 67, n. 10.
Cumberland also argues strongly that Dairy Mart does not meet the threshold requirement for equitable relief — that Dairy Mart's breach be neither willful nor grossly negligent. "A court of equity will apply the doctrine of clean hands to a tenant seeking such equitable relief; thus, a tenant whose breach was `willful' or `grossly negligent' will not be entitled to relief." Id. at 167. (Citations omitted.) Cumberland claims that Dairy Mart was at least grossly negligent in not paying Cumberland rent from May, 1988 to February, 1989, when Dairy Mart knew from the Lauro correspondence that Cumberland was the landlord under the sublease, and that Dairy Mart acted willfully after February, 1989, result of by not paying the rent to Cumberland on a current basis beginning in March while the calculations concerning the arrearage were made. Cumberland fails to note, however, that Lauro never asked for rent payments on a current basis. He apparently was satisfied with Laura Messina's commitment, in her April letter and later verbally, to make payment on receipt of the calculations. In the absence of request or demand, Dairy Mart's failure to pay cannot be found willful.
Nor does the court find that Dairy Mart acted in a grossly negligent CT Page 5392 manner. Although Dairy Mart was negligent in not paying the rent, Dairy Mart personnel acted diligently to attempt to obtain the information needed to correct the nonpayment situation when Chevron started returning the rent checks. Dairy Mart's diligence was not met, however, with like diligence on the part of Cumberland, which consumed months simply to determine the amount of rent which was owed. The facts found by the court do not demonstrate gross negligence on the part of Dairy Mart.
Cumberland contends also that equitable relief from forfeiture cannot be granted because the default in question was far more egregious than that in any of the other pertinent cases. Cumberland claims that a nineteen-month rental default (May 1988 to December 1989) is simply too long a default to warrant equitable relief.
This argument fails, however, to account for Cumberland's contribution to the period of default through its own negligence. This is not a case where a tenant knowingly neglected to pay its rent for nineteen consecutive months. It is a case where as a result of a major corporate acquisition involving 600 gasoline stations in ten states, including the sublease for the premises, there was confusion about the identity of the landlord and where to send rental payments. The tenant diligently sought to obtain the necessary information from a confused landlord, who could not calculate the amount owed for seven months after the tenant requested it. Throughout the entire period of nonpayment the tenant consistently affirmed its intention and willingness to pay the rent and did tender the arrearage within approximately thirty days after calculations were finally provided.
On the facts as found by the court, Dairy Mart is entitled to equitable relief from the forfeiture of the sublease. Judgment is entered for the defendant.